FOSTER v. DUNN et al.   (No. 227.)

(Court of Civil Appeals of Texas. Beaumont. Oct. 19, 1917.)

1. LANDLORD AND TENANT ⟨key⟩231(6)—ACTION FOR RENT—NOVATION OF LEASE—SUFFICIENCY OF EVIDENCE.

In an action for rent, evidence of a modification of the lease by lowering the rent for one year *held* too slight to be submitted to the jury.

2. TRIAL ⟨key⟩255(12) — REQUESTING INSTRUCTIONS—NECESSITY.

In an action for rent, where the court instructs the jury to find for plaintiff in the amount specified in the lease, it was the duty of the lessee to request special instructions concerning a claimed modification whereby he was to pay less rent.

Appeal from District Court, Harris County; Wm. Masterson, Judge.

Suit by Mrs. Sarah P. Dunn, a feme sole, and Annie Lee Eicke, joined pro forma by her husband, J. O. Eicke against M. E. Foster. Judgment for plaintiffs, and defendant appeals. Affirmed.

Gill, Jones, Tyler & Potter, of Houston, for appellant. N. B. Judd and Fisher, Campbell & Amerman, all of Houston, for appellees.

BROOKE, J. This suit was filed by and in behalf of Mrs. Sarah P. Dunn, a feme sole, and Annie Lee Eicke, joined pro forma by her husband, J. O. Eicke, to recover of and from the defendant, M. E. Foster, certain rentals alleged to be due for a 12-month period under a certain 99-year lease. The cause was tried before a jury, and at the conclusion of the testimony, on January 24, 1916, the defendant, M. E. Foster, moved for a peremptory instruction in favor of plaintiffs for the amount of $2,400, which he claimed was due according to his theory of the case, instead of the $3,600 due in accordance with plaintiffs' theory of the case. Defendant Foster's motion for a peremptory instruction in this regard was by the court refused. At the same time, plaintiffs moved for a peremptory instruction for the full amount sued for, being the sum of $3,600.

After considering this motion, and after overruling defendant's motion for a peremptory instruction, the court gave this charge:

"In this case you are instructed to return a verdict in favor of the plaintiffs for the amount due on the lease offered in evidence before you, together with 6 per cent. interest thereon.

"Wm. Masterson, Judge Presiding."

The record further discloses that no special instructions were asked by the defendant, except the special instruction asking for a peremptory instruction for the amount admitted to be due by the defendant.

The amended original petition of the plaintiffs set up the 99-year lease, as follows:

"The State of Texas, County of Harris. This agreement and lease contract this day entered into by and between Mrs. Sarah P. Dunn, a widow, and Annie Lee Eicke, joined herein by her husband, J. O. Eicke, hereinafter called lessors; and M. E. Foster, hereinafter called lessee, witnesseth:

"First. That the lessors are the owners in fee simple of that certain tract or parcel of land, being lots nine (9), and ten (10), and the adjoining forty (40) feet off of lot eight (8), in block one hundred and thirty-two (132) fronting one hundred and four (104) feet on McKinney avenue, and one hundred and forty (140) feet on San Jacinto street, all on the South Side of Buffalo bayou, in the city of Houston, Harris county, Texas, together with the improvements and buildings now thereon.

"Second. The lessors, for and in consideration of the rents hereinafter reserved, and the covenants and agreements of the lessee hereinafter contained—which said covenants and agreements are understood and agreed to be conditions precedent to any continued possession, or right of possession, of the leased premises on the part of the lessee—the lessors have demised, let and leased, and do by these presents demise, let and lease unto the lessee all of the above-described premises and improvements, for and during the term of ninety-nine (99) years from and after the date of execution hereof, unless the said term be sooner terminated under the terms hereof.

"Third. The lessee agrees and binds himself, in consideration of the leasing aforesaid, to pay to the lessors as rent for said premises, during the whole of the term aforesaid, the sum of three hundred ($300.00) dollars per month for the first twenty-five (25) years hereafter, and three hundred thirty-three and $33/100$ ($333.-33) dollars per month for the remaining sixty-four (64) years; said amounts to be paid on the first day of each month in advance, in the equivalent of gold coin of the United States of America, of the weight and fineness now obtaining at the mints of the United States; and each of such payments to be made without any deduction or abatement whatever, at the First National Bank of Houston, in the city of Houston, Harris county, Texas, or such other place in the city of Houston as the lessors may in writing direct; and also as a further consideration for the lease herein, and as additional rent, the lessee covenants, agrees and binds himself to pay in full all taxes and assessments, water rents, and other impositions and tax levies of any nature whatsoever, ordinary or extraordinary, general and special, which may be levied, charged or imposed upon said premises or any part thereof, or any improvements which may now be thereon, or which may be hereafter placed thereon, for and during the whole of the term of this lease as aforesaid.

"Fourth. Upon the payment of the sum of sixty-six thousand and $00/100$ ($66,000.00) dollars to the lessors by the lessee, at any time after the first year, and within a period of twenty-five years from and after the execution of this lease, such payment to be made in cash, or upon terms of part cash and part deferred payments, the lessors agree to deliver to the lessee a warranty deed to the property herein leased, and such agreement as to the privilege of the lessee to purchase this property as above stated, is construed as a vital element of this lease, but not as a waiver of any of the further terms and conditions of this lease, in case the option to purchase is not exercised by the lessee.

"Fifth. It is further agreed that the lessee shall have the right to sublet and subrent all or any portion of the leased premises—however only for lawful purposes—or to assign said lease provided the lessee shall continue originally liable for the performance of each and all of the terms and conditions of this lease, unless at the time of such subleasing or subrenting the lessee shall have erected improvements thereon of the value of ten thousand ($10,000.-00) dollars in excess of all incumbrances thereon.

"Sixth. And it is further understood and agreed that in case at any time default shall be made by the lessee in the payment of any rent herein provided for, upon the day the same shall become due and payable, and the same shall remain unpaid for a period of sixty days after becoming due; or if the lessee shall fail to pay any rates, taxes or assessments herein provided to be paid by the lessee before suit shall be filed on the same; or in the event the lessee fails in keeping and performance any and all of the covenants and agreements of this lease by the lessee to be kept or performed, after sixty days' notice of such nonperformance, then in any or either of such events it shall be the lessors' right to declare this lease terminated and ended, and it shall thereupon be the right of the lessors to re-enter and take possession of the premises herein leased, together with the improvements which are now thereon, or which may hereafter be placed thereon; provided nothing herein is construed as waiving the lessee's right to contest in the courts any taxes or assessments considered illegal or unwarranted.

"Seventh. It is further understood and agreed by and between the parties hereto that in the event of the termination of this lease, at any time before the regular expiration of the lease term of ninety-nine (99) years, upon a breach by the lessee of any of the covenants herein contained, that then all buildings, fixtures and improvements then situated on said leased premises, by whomsoever there placed, shall be forfeited to said lessors, and become their property, and no compensation therefor shall be paid to said lessee.

"Eighth. It is further understood and agreed by and between the parties hereto, that the lessors shall, at all times, have, and there is now expressly given in their favor, a valid first lien on and against any and all property of whatever kind which may be erected or built on said premises, or which may be placed in any buildings or improvements on said leased premises, in order to secure the payment of all rent, moneys and other obligations which may become due and payable, as herein specified.

"Ninth. It is agreed and understood that the various rights, powers, options, elections and remedies of the lessors contained in this lease, shall be construed as cumulative, and no one of them is exclusive of the other or exclusive of any rights or remedies allowed by law.

"Tenth. It is further understood and agreed that no waiver of a breach of any of the covenants of this lease shall be construed to be a waiver of any other or succeeding breach of the same or other covenant.

"Eleventh. It is mutually covenanted and

agreed by and between the parties hereto, that each of the expressions, terms, conditions and promises of this lease shall extend to and bind or inure to the benefit of (as the case may be) not only the parties hereto, but each and every of the heirs, executors, administrators and assigns, of the respective parties of the first and second part hereto; and wherever in this lease a reference to either of the parties hereto is made, such reference shall be deemed to include, wherever applicable, also a reference to the heirs, legal representatives, successors and assigns of such party, the same as if in every case expressed, and all the conditions and covenants contained in this lease shall be construed as covenants running with the land.

"Twelfth. It is agreed that the lessee may from time to time during the continuance of this lease, alter or remove the improvements now upon said property, or that may be hereafter erected thereon, and the said property so removed shall become the property of the lessee, provided that before such removal or alteration is begun the lessee shall give sufficient security that said lessee shall, within six months after such removal or alteration, begin the erection of other improvements on said property of the value at least equal to the improvements removed, and shall complete the erection of such new improvements with all reasonable dispatch. Should the parties hereto disagree as to the sufficiency of such security offered, the same shall be fixed by arbitration, in the same manner as hereinafter provided. And it is further agreed that should the improvements now on said property, or the improvements hereafter to be erected on said property, be destroyed by fire, storm or other casualty, the lessee shall, with due diligence, construct repairs or new improvements on said premises equivalent in cost to the insurance collected by the lessee for said loss or damage.

"Thirteenth. It is further agreed and understood that at the end and expiration of this lease, ninety-nine (99) years, the same shall, at the option of the lessee, be renewed for another term of ninety-nine (99) years, at a rental to be agreed upon by and between the lessee and lessors, but if no agreement can be reached by them as to the rental value of said property and improvements, within sixty (60) days before the expiration of the same, then the lessors shall designate one man, the lessee another, and these two shall choose a third, who shall meet together and fix a fair and reasonable rental value upon said premises, which arbitration shall be conclusive and binding upon the parties when made as herein provided; and if the lessee shall fail or refuse to accept the rental value and pay the same as determined by said board of arbitration, then, and in that event, immediate and peaceable possession of all and singular the premises and improvements then thereon shall be given to the lessors and become and be their property.

"Witness our hands this 18th day of September, A. D. 1911, at Houston, Texas, signing in duplicate.

"[Signed] Mrs. S. P. Dunn.
"Mrs. Annie Lee Eicke.
"J. O. Eicke.
"M. E. Foster."

(Said instrument is duly and legally acknowledged by Mrs. Sarah P. Dunn, and by Annie Lee Eicke, and J. O. Eicke, in Harris county, Tex., on September 18, 1911, and by M. E. Foster on September 19, 1911.)

This petition alleged that the rental therein stipulated was due from December, 1914, to and including November, 1915, 12 months, in the sum of $300 per month, aggregating $3,600. The defendant in his amended original answer admitted the execution of the

lease and its terms as pleaded, and his failure to pay rentals for the period of a year beginning with December, 1914, but alleged that in the early part of 1915, an agreement was had between plaintiffs and defendant whereby the plaintiffs contracted that for a period of 12 months, beginning with December, 1914, the rental would be $200 instead of $300 per month. The defendant claimed to have tendered into court the sum of $200 per month for the 12-month period, but, in fact that tender was only made in the pleadings, as no tender of any money was ever made actually into the registry of the court, either before or after the trial. By supplemental petition, plaintiffs alleged that the transaction between the parties with reference to the reduction of the rental was nothing more than an offer upon the part of the plaintiffs, which was never accepted by the defendant until after said offer had been recalled, and, further, that said offer or agreement to reduce the rentals, if any was made, was wholly without consideration to support it.

[1] The first assignment of error complains of the action of the court in refusing to give in charge to the jury defendant's special charge No. 1, which is as follows:

"Gentlemen of the jury, you are instructed that, under the law applicable to the evidence that has been introduced upon the trial of this cause, the plaintiffs are entitled to recover from the defendant the sum of $2,400, and therefore you will return your verdict in favor of plaintiffs for that amount"

—for the reason that the undisputed evidence showed a valid agreement, based upon a sufficient consideration, between plaintiffs and defendant, to accept said amount for the rental obligation during the year 1915, in lieu of the amount stated in the lease, thus constituting a valid novation. This assignment is submitted as a proposition, and in addition thereto, the following propositions are urged:

"(a) If, through change of circumstances, a contract becomes oppressive, an agreement to increase or diminish the consideration, or to annul or modify it, is not invalid for want of consideration.

"(b) Any consideration, however slight, is sufficient to support a novation.

"(c) Parties to an agreement may, by mutual concurrence, change its terms at any time after its execution so as to meet their pleasure or interest."

On the contrary, it is insisted by appellee:

"The court was correct in refusing to give the peremptory instruction requested by defendant, for the reason that the evidence was undisputed that no novation was ever had."

Appellees do not file any counter proposition to the second, third, and fourth propositions under the first assignment of error, for the reason, they say, that they are not germane to the assignment; that the first assignment of error complains of the court's refusal to give a peremptory instruction in favor of the defendant; that the second, third, and fourth propositions under the first assignment might be proper if subjoined to

an assignment complaining of the refusal to give special charges requested by the defendant, covering the issues of whether a novation of the contract was had. They say that no such special instructions were asked, in which statement the record bears them out. The propositions, they say, as abstract questions of law, may be conceded, but they have no application to the first assignment, which deals only with the refusal to give a peremptory instruction. Further, they argue that no theory upon which the peremptory instruction asked by the defendant could have been given without the commission of active error.

The defendant, Foster, in his pleadings, admitted the execution of the lease, and admitted liability thereunder, but sought to establish that by mutual consent the rent had been reduced from $300 per month to $200 per month, covering the period from December, 1914, to December, 1915. Foster did not take the stand, and the only evidence offered was the evidence of E. O. Eicke and the letters and correspondence in connection with the attempted novation. An examination of the correspondence discloses, in our judgment, that no agreement was ever made by the parties reducing the rent to $200 per month.

The testimony of the only witness in the case is as follows:

"I am the husband of Mrs. Annie Lee Eicke and son-in-law of Mrs. Sarah P. Dunn, plaintiffs in this suit. I am familiar with the lease contract between Mrs. Dunn, Mrs. Eicke, and Mr. Foster, having attended to the collection of the rents for them. The last rent was paid in November, 1914, and no payment has been made since that time. Of course, I demanded payment of this rent. It was not paid, although I made formal demand once or twice."

On cross-examination Mr. Eicke testified as follows:

"In this lease matter I have been representing Mrs. Dunn and my wife; I have been looking after it for them as their agent. I do not recall any discussions with reference to whether or not this lease was forfeitable upon the part of the lessee. Personally, I never considered the lease in such way until Mr. Foster suggested it in one of his letters, saying that he would like to discontinue the lease. Then we investigated to see if such a thing were possible. I wanted some legal advice on that, and I went to our lawyer and discussed the matter with him. Subsequent to that time a proposition was made and discussed under which Mr. Foster was to pay $200 per month for a year, and we had such an agreement. Mr. Foster requested that on account of and during these hard times we make a reduction from $300 a month. I didn't take the authority on myself, I told him I would discuss the matter with Mrs. Eicke and Mrs. Dunn, and advise him accordingly, which I did in a letter, we agreeing to the $200 per month for the 12 months, and to the terms under which it should be paid. I do not remember the dates of these various discussions. I would have to refer to the letters."

Defendant introduced in evidence letter of January 23, 1915, written by the estate of Frank Dunn, by J. O. Eicke to Mr. M. E. Foster, as follows:

"I was up to see you the other day, and am sorry I didn't catch you before you got away. As I told you before, I did not think that Mrs. Dunn would be willing to give up the lease, and after consulting her attorney she does not see any reason why she should do so. On your return, if you will advise me, I shall be glad to come up and see you further about the matter."

Witness continued:

"I do not know where Mr. Foster was going. I believe he made two trips to New York. I think he told me he would be in New York."

Defendant introduced in evidence letter of February 13, 1915, from M. E. Foster to J. O. Eicke, as follows:

"I returned a day or two ago from New York and find your letter of the 23rd ult. on my desk. I will be very glad indeed to see you on Tuesday the 16th in regard to the matter of that lease."

Defendant introduced in evidence letter of February 23, 1915, from J. O. Eicke to M. E. Foster, as follows:

"Referring to the matter of the lease on property at the corner of San Jacinto and McKinney: I have had a talk with the parties of the estate, and we are willing to continue the lease at the rate of $200 per month for 12 months. This rate to begin with the month's rental past due and to extend for one year.

"Kindly advise me if this is satisfactory and just what you will do with the proposition."

Witness continues:

"The month's rental past due was December, 1914. I had talked to Mrs. Dunn and my wife before writing this letter."

Defendant introduced letter of February 24, 1915, from M. E. Foster to J. O. Eicke, as follows:

"If I understand your proposition to mean that you will begin with $200 per month assessment from the last payment made you, and continue for twelve months from January 1, 1915, I will accept same, although I would far prefer to let the property revert to the Dunn estate. If you will let me have an answer to this by return mail, I will have the proper papers to be signed prepared, and will mail you check covering the past due accounts."

Witness testified:

"The payment last made was for the November, 1914, rent."

Defendant introduced letter dated February 25, 1915, from J. O. Eicke to M. E. Foster, as follows:

"Replying to yours of the 24th inst., it is our intention to allow you a total of twelve months at $200.00 per month, as stated, but the starting point will be the first month unpaid, which is December instead of January, as proposed in your letter. Quoting from yours of December 7, 1914, 'I intend to make the December payment some time in January, and the January payment some time in February, and then catch up on payments some time during the spring.' Please check this up and on finding that we are correct, draw up your papers and we will proceed to sign them, according to your last letter, with the above exception."

Defendant introduced letter of February 26, 1915, from M. E. Foster to J. O. Eicke, as follows:

"Your letter of the 25th is entirely satisfactory, except that I would like to pay $200.00 cash for the December lease rental, giving my note for $400.00 due in ninety days, and then

pay the March rental in cash on or before March 1st."

Defendant introduced letter of February 27, 1915, from J. O. Eicke to M. E. Foster, as follows:

"Answering yours of the 26th inst., I am handing you herewith note already made out for $400.00 due June 1st, with interest from maturity. This note is to cover lease rental for months of January and February. According to your proposal, you will pay cash for the December lease rental, amounting to $200.00. Please include in your check for this rental, $16.00 to cover interest on past due payments and the note properly executed. On receipt of the above note properly executed, and your check for $216.00, your lease rental account will be taken care of up to March 1, 1915. You further propose to pay the March rental in cash on or about March 1st.

"Thanking you for your prompt attention, I am."

Witness testifies further:

"I do not know whether Mr. Foster went to New York on business about that time or not. I just waited for a reply to my letter; that is all. Mr. Foster has told me a couple of times that he was going to New York, but whether it was just before this letter or not, I do not recall."

Defendant introduced letter of March 30, 1915, from J. O. Eicke to M. E. Foster, as follows:

"Referring to our letter of the 27th ult., we have not as yet received your reply. Please let us hear from you without further delay and very much oblige."

Defendant introduced letter of March 25, 1915, from J. O. Eicke, to M. E. Foster:

"I have not heard from you in reply to my recent letter 3—20 asking for some action. I must have something definite right away without further delay, as the folks are pressing me for some action in the matter."

Witness continues:

"I don't recall whether I knew that Mr. Foster was up there, in New York or not, for I don't think I so much as phoned his office during that time. I had formerly talked to him over the phone at his office, and I had been to his office to transact this business, and I knew that his office was in the Chronicle Building."

Defendant introduced letter of March 27, 1915, from M. E. Foster to J. O. Eicke, as follows:

"In response to your letter of the 25th inst. will state that I have not been able thus far to make the arrangements you desire in regard to the lease on the property at the corner of San Jacinto street and McKinney avenue. I wish you would call to see me say next Monday or Tuesday, and I will endeavor to straighten out the entire matter. Regretting the delay, and assuring you of my appreciation of your many courtesies, I remain."

Witness continues:

"The arrangements that I desired was sending the check for the December rental and the note for January and February, and that's what Mr. Foster referred to by the words 'making the arrangements.'"

Defendant introduced in evidence a letter of April 14, 1915, from N. B. Judd and Fisher, Campbell & Amerman, Attorneys, to M. E. Foster, care of the Vanderbilt Hotel, New York, N. Y., as follows:

"We have been employed by Mrs. S. P. Dunn, Mrs. Annie Lee Dunn Eicke, and Mr. J. O. Eicke, to collect the $1.500 due them by you as rent on the premises leased from them by you on the corner of McKinney avenue and San Jacinto street in the city of Houston, Texas, same being the rent for December, January, February, March and April. Now we do not want to have a law suit over this matter, but unless it is adjusted satisfactorily immediately, we will file suit. Trusting that you will give the business your attention at once and save the expense of litigation, we are."

Plaintiff introduced in evidence telegram of April 23, 1915, from M. E. Foster to N. B. Judd:

"Thought matter mentioned your letter fourteenth had been arranged through Mr. Eicke. Will be home next week and endeavor to settle satisfactory to all parties."

Defendant introduced letter of May 1, 1915, from J. O. Eicke to N. B. Judd, as follows:

"After you had seen Mr. M. E. Foster, he called me up in reference to the lease and offered to close the matter up on the basis of our former compromise. On taking the matter up with Mrs. Dunn we have agreed to allow Mr. Foster eight months, or the balance of this year, beginning May 1st, $100.00 a month on his lease; making it $200.00 a month, payable in advance, on the first day of the month. This agreement is made providing he will give us his check now for $1,700.00, the amount of all past due rent. This is in no wise to interfere with the general terms of the lease. Unless these terms are satisfactory to Mr. Foster, you are authorized to proceed as instructed heretofore."

Witness continues:

"During April I think it was, I had had some negotiations over the phone with Mr. Foster with reference to this lease and the compromise. I was out of the city of Houston practically the whole month of May. I was at Sweetwater, having left Houston somewhere around May 1st. I did not notify Mr. Foster that I was going to leave the city."

Defendant introduced letter of May 2, 1915, from M. E. Foster to J. O. Eicke, as follows:

"I take pleasure in inclosing herewith my note for $400.00, dated March 1, 1915, and my check for $216.00 in payment of rent to March 1, 1915, as per your written proposition on February 27th last. This has been held up on account of the negotiations I have had with you, and with which you are familiar. I still owe you for the March and April lease rentals, and inclose my check for $400.00, being in payment of lease rentals to May 1st. In accordance with the proposal of yourself and Mrs. Dunn, I will continue the payments during the remainder of the year 1915 on the basis of $200.00 per month. I will make you the May payment on or about May 15th."

Witness testifies:

"I received that letter together with the inclosures. During the time between January 25th, or thereabouts, and up to the time of that last letter, Mr. Foster and myself had been carrying on these negotiations relative to the compromise. By referring to the last letter, I mean the one dated March 27, 1915, where Mr. Foster suggested I come to see him at his office Monday or Tuesday. There were no further negotiations with Mr. Foster after that time—after the time I called at his office, which was either Monday or Tuesday, I don't remember which. As to whether the negotiations between Mr. Foster and myself, orally, in writing and over the telephone with reference to this compromise extended from the last day of January, 1915, down to May 3d of that year, I do not think they ex-

tended that long. The severing of all relations between us with reference to this compromise was some time prior to the time Mr. Foster wrote the letter that he would be glad to see me in his office Monday or Tuesday. I don't remember the date of that letter. I mean to say that after March 27, 1915, I personally had no negotiations with Mr. Foster. It is possible that the phone call mentioned in my letter to Mr. Judd, that is when Mr. Foster called me up over the phone, occurred after that date. During the month of April I was not talking to Mrs. Dunn and Mrs. Eicke about the matter of this compromise. Between us we may have talked about it, as stated in my letter to Mr. Judd of May 1, 1915, but I didn't talk to Mr. Foster any further about it. If he would have come to me I would have talked about it. It is possible that he did ring me over the phone, as stated in the letter. I think I said to Mr. Foster over the phone that I would not take the $200 per month. I could not tell you when it was. I do not even remember the month it was in, but some time after this visit I made to his office in answer to the last letter he wrote me on March 27th. Yes, sir, I just now said it was some time after that visit. No, sir, it might not have been December 15th. It was very likely in April. I just told Mr. Foster on that occasion that I had turned the matter over to Mr. Judd, and to continue the negotiations with him. I do not recall after that writing to Mr. Judd and telling him that provided Mr. Foster would make certain payments he was not to bring suit. Let me see the letter of May 1, 1915. I do not recall it. (After reading the letter.) This is correct. Yes, sir, I was incorrect in my statement a moment ago. Yes, sir. I told Mr. Foster in the month of April that this matter was all called off, and Mr. Judd was going to sue him. I did not know that Mr. Foster was in New York almost the entire month of April. The statement I made was not a positive one, because I do not recall the date. I think Mr. Judd wrote a letter to Mr. Foster in New York at the Vanderbilt Hotel. I think that the letter was at my behest. When I said that I told Mr. Foster the thing was off, I did not make that as a positive statement. That is the way I recollect it. I told Mr. Foster over the phone that this lease and compromise was off. Yes, sir, I remember that it was over the phone. I said it was over the phone. I might make a statement prior to that. At the time that I was canceling the negotiations with reference to the compromise, the only thing that I said to Mr. Foster over the phone was that the matter was in Mr. Judd's hands, and to conduct his negotiations with him. That is all I recall, except that it was in Mr. Judd's hands, and he would handle it according to instructions from us. I do not recall ever having told Mr. Foster at any other time that these negotiations were off with reference to the compromise."

Defendant offered in evidence voucher No. 468, drawn by M. E. Foster on the Union National Bank, payable to the estate of Frank Dunn, for $400, dated May 3, 1915, the following notation appearing thereon:

"Payment in full March and April lease rental on lots 9 and 10 and part of lot 8, block No. 132."

Defendant offered in evidence voucher No. 467, drawn by M. E. Foster on Union National Bank, payable to estate of Frank Dunn, dated May 3, 1915, bearing the following notation thereon:

"Payment December lease rental on lots 9 and 10 and part of lot 8, block No. 132."

Defendant offered in evidence promissory note dated March 1, 1915, payable to the estate of Frank Dunn, with interest at the rate of 8 per cent. per annum, payable three months after date, providing for 10 per cent. attorney's fees if default is made in its payment at maturity and it is placed in the hands of an attorney for collection, bearing the following typewritten notation:

"When this note is paid, it will be in full settlement of January & February lease rental on lots 9, 10 & part of lot 8, Blk. No. 132."

Witness testified:

"I think these are the three instruments, the two checks and the note that came in the letter of May 3, 1915. I think these instruments were turned over to Mr. Judd. No, sir; I do not recall saying anything to Mr. Foster about it. I am not positive whether I turned them over to Mr. Judd, or whether Mrs. Dunn took them up there. I think that we decided that they should be returned, and that he should ask him for the full amount of the rental. We had decided by that time that we would not take the $200 per month; that we would demand $300 or nothing."

Defendant introduced in evidence letter of May 12, 1915, from N. B. Judd, attorney, to M. E. Foster, as follows:

"I am herewith returning your check for $216, your check for $400, both dated May 3, 1915, and your note for $400, dated March 1, 1915, and due three months after date, all payable to the estate of Frank Dunn, as you and they have not succeeded in getting together on the rent matter."

Witness continues:

"I think I was in Sweetwater between May 3d and May 12th, and that time was possibly consumed in the mail. After the receipt of the letter containing the inclosures, I made no effort to get Mrs. Dunn and Mrs. Eicke to agree to take the $200 under that compromise. I did not tell Mr. Judd not to return those letters to Mr. Foster until I could see whether the matter could be arranged. Mrs. Eicke was with me in Sweetwater, and that is not just clear how that was handled—I think largely through Mrs. Dunn. The entire matter was left for her decision. I always resented any proposition Mr. Foster made to her for her final decision, taking no authority in the matter at all. In reality, when I originally agreed on this $200 compromise with Mr. Foster, I had referred it to Mrs. Dunn, and it was her mind that accepted it. As to whether it was she who authorized the return of these checks that were tendered on May 3, 1915, I am not just positive whether I wrote Mrs. Dunn or wrote Mr. Judd about that from Sweetwater; one or the other. At the time I was in Sweetwater during the first part of May I really had no great interest in the matter of accepting $200 a month. It was just left with Mrs. Dunn if she wanted to compromise it that way. I was acting for her altogether. Mrs. Dunn said to me that she wanted the offer of compromise and the compromise agreement made with Mr. Foster withdrawn. She said this at home after Mr. Foster had made the written appointment for Tuesday or Wednesday. Then when I called at his office shortly after that I learned that he had gone to New York. Mr. Foster invited me to his office on two or three occasions. I am stating on the last occasion. After I got the letter from Mr. Foster telling me to come to his office, Mrs. Dunn told me she wanted the compromise withdrawn. Subsequent to that I went to the office to find Mr. Foster, and he was gone. I do not recall all the telephone conversations and just what was said at each one. The negotiations had not been withdrawn

up to the time he wrote that letter. Yes, sir; I had in reality rung him over the phone, but I did not withdraw the compromise offer until after the letter of March 27th. Just when it was I do not know. It may have been a month after. I am not stating any dates positively. In testifying to a withdrawal of an agreement upon which our controversy rests I am trying to fix them as well as I can. As to whether I rang up Mr. Foster and called it off or called upon him for that purpose I cannot answer positively, because I do not recollect. I am positive in a conversation with Mr. Foster—when it was I don't remember, but it was after he had made an appointment with me to call at his office on Monday or Tuesday, when I went there and learned that he was in New York, and learned that he knew he would be in New York at the time he wrote the letter. Right then and there I decided to have no further negotiations with Mr. Foster. On his return he called me up. Then I told him to take the matter up with Mr. Judd. I do not know the date I told him that, but I am sure it was after his return from New York. I think Mr. Foster had talked to Mrs. Dunn, but prior to Mr. Foster's return from New York he did not know from me that Mr. Judd or that Judge Amerman were in this matter, but I think Mr. Judd wrote him as soon as I gave it to him. The letter that Mr. Judd wrote to Mr. Foster in New York, stating that unless he came across with $300 a month they were going to sue him, was written before I had said anything to Mr. Foster about withdrawing the compromise agreement."

Redirect examination:

"Yes, sir; all of the negotiations, or nearly all of them, were reduced to writing, and were shown by the letters offered in evidence by Mr. Foster. These negotiations began, I think, in December. The rent was due December 1st, and Mr. Foster had been in the habit of paying before the 10th, and when a check did not come I may have telephoned him before I wrote any letters and just asked him about it."

Plaintiff introduced in evidence letter of December 7, 1914, written by M. E. Foster to J. O. Eicke, as follows:

"On account of the fact that tax-paying period has arrived and I will need to conserve all my finances this month, I have decided to take advantage of the sixth clause in my lease with Mrs. Dunn and children for the property at the corner of San Jacinto street and McKinney avenue, whereby I have the privilege of taking sixty days' time in payment of rent. In other words, I intend to make the December payment some time in January, and the January payment some time in February, and then catch up on payments some time during the spring."

Witness continues:

"After November, 1914, none of these payments were made. I think it was in February that the estate of Frank Dunn, by me, offered to permit Mr. Foster to pay $200 per month for 12 months, and that was the beginning of the matter of paying $200 a month in lieu of $300. Mr. Foster opened these negotiations with me to secure a reduction of the rent. His reasons were that on account of the hard times many of his properties were vacant, and that he had reduced the rent from 33⅓ per cent. to 50 per cent. on many of them, and he felt that he was getting so little income on that property, and on account of the general business conditions he asked if we would consider a reduction in his lease rentals, and I told him that I understood the conditions thoroughly, and we were suffering the same way with the rental incomes, and I would personally take

the matter to Mrs. Dunn, which I did. That letter was the result. That was in his office where I went on his invitation. Mr. Foster did not prepare any papers referred to in his letter to me of February 24th introduced in evidence. He did not mail me any checks other than the ones mailed me on May 3d. No, sir; Mr. Foster did not ever draw up any papers. No, sir; up to February 26, 1915, no discussion had been had by anybody agreeing to take Mr. Foster's note for anything. Prior to the 27th no interest or note had been discussed, except in the letter that he wrote. Meanwhile, I had taken up the second proposition to execute the note with Mrs. Dunn to which she assented. From February 27th to March 25th Mr. Foster did not ring me up or talk with me or write me any letters upon the matter that I recall. I have examined my files and turned over to you all copies of letters written by me and all originals written by Mr. Foster that were in the files in the usual and customary place. I do not recall having any conversation with Mr. Foster about the matter between my letters to him and March 27, 1915. In that letter he makes an appointment to meet me on Monday or Tuesday. I kept that appointment, and when I went there I was advised he had gone to New York. I cannot say positively how long he had been gone to New York. Mr. Foster's secretary told me when he had gone, but I only recall that it was prior to that time. Yes, sir; it is correct that when I called on Mr. Foster and kept that appointment and found he had gone to New York I turned the matter over to Mr. Judd and to you with instructions to enforce the payment of the entire indebtedness. I do not think that I saw the letter to Mr. Foster written by Mr. Judd and addressed to him at the Vanderbilt Hotel prior to the time it was sent. Yes, sir; I knew that following my instructions you were to demand of Mr. Foster the full amount at the rate of $300 per month. Yes, sir; those were my instructions to you. After Mr. Foster's return he undertook to renew negotiations looking to some settlement of the matter. On May 1, 1915, the following months were due: December, January, February, March, and April. Five Months. On May 1st, six months were due. Evidently from the letter. On or about May 1st I took up new negotiations with Mrs. Dunn looking to a settlement of the matter at the request of Mr. Foster. The new offer was different from the first one in this: Before we had offered him a rebate of $100 a month for 12 months, and in this second offer we offered to allow him, beginning May 1, $100 per month on this lease, making it $200 a month, payable in advance on the first day of the month, that is the balance on the year. Yes, sir; that is seven months. No, sir; after he got back from New York I never agreed to settle upon the old basis. This second agreement was made, providing he would give his check at that time for $1,700, the amount of all that was past due. I have given everything that occurred in our telephone conversation, or in these letters, between Mr. Foster and myself. I do not recall when it was that I went to Dallas and Sweetwater, around May 1st, but I think I left on Saturday. After I left for Dallas or Sweetwater, I think I did not have any conversations with Mr. Foster, for it was almost June 1st before I got back, and the suit was filed before I got back, some time in May. I remember having only one conversation with Mr. Foster after he got back from New York until I left for Dallas and Sweetwater. Yes, if Mr. Foster at any time prior to March 27, 1915, had sent me the check and the note, I would have accepted it in payment of the rent. We had made all these numerous propositions

in order to settle the account and get it straight."

Recross-examination:

"Yes, sir; I say that if you had come to me before March 27th, I would then have accepted it; that is right. At the time the proposition was made, and thereafter, up to March 27, 1915, I did not state that date as the limit upon which Mr. Foster could make remittance. I did not make the statement to my counsel that the remittance must be made before March 27th. No, sir; I did not place that time limit upon the proposition to Mr. Foster. Yes, sir; Mr. Foster said it was hard times, and he would like to get that reduced to $200. Yes, sir; it sure was hard times, and it is now. No, sir; I would not have been in Mr. Foster's office if this amount had not been due me. It is pretty hard to get into Mr. Foster's office. The fact that I had this amount coming due is what led up to all these negotiations, and finding that it was hard times, and Mr. Foster would probably be delayed some time, I was willing to accept less to get the money right then. Under the terms of the lease I could not forfeit it before 60 days after default on the part of the lessee. Practically all of the negotiations were in writing, but there were some telephone conversations. The correspondence covers the ground fully, and the telephone conversations were in connection with the written matter. On his return from New York Mr. Foster called me up, probably in connection with the telegram he sent Mr. Judd that he would be home in a few days and straighten the matter out satisfactorily to all concerned. I do not recall the date. No, sir; I did not know that Mr. Foster was in New York practically the entire month of April. I did not know that he was here. I said that I notified him of the cancellation of the lease over the phone probably during the month of April. Let me make that statement clear. I called on Mr. Foster in answer to his letter, which was written March 27th. He told me to call Monday or Tuesday, and I called either Monday or Tuesday. It was within a week after March 27th. Now between March 27th and the time I called upon him I had rung him over the phone. No, sir; I did not state just a moment ago that I had not rung him over the phone. I do not think I did. I recall distinctly now I did. A moment ago I didn't. I did not have the date in mind. I do not think I testified that I did not ring him up between the 27th and the date you called. At the time I called him over the phone I did not call off the compromise, and when I went up there Monday or Tuesday, it was to effect a settlement if I could. That is what I went to his office for, and I presume that's what he wanted me to come for. The settlement was to be upon the terms as reflected by these letters. When I found that he was not there, but was in New York, I never said anything more to him until he had returned, and made me the tender on May 3d."

Redirect examination:

"Yes, sir; the period covered by this controversy expired on 1st of December, 1915. Mr. Foster had not paid any rent for December and January of this year. I have not investigated the payment of taxes by Mr. Foster. No, sir; I did not say anything to Mr. Foster, or write him any letter, notifying him that the offer which I was taking up with him was to remain open indefinitely. I likewise made no definite date for its closing. Yes, sir; at any time before I placed the claim in the hands of my attorney I would have accepted the money if he had tendered it to me. The only arrangements necessary for him to make in order to comply with this agreement was for him to draw a check and send me that note."

Recross-examination:

"No, I did not make any complaint because he didn't comply with this arrangement right then. I was making every effort I could to make the collection. It was just like you owing me $100 and me sending you a note; please pay it. That's all, but it is not like me telling you that if you didn't pay in a week you would owe me $200."

Redirect examination:

"I didn't do anything but dun him every two or three days. I left for Sweetwater on the night of the 3d, Monday night."

Recross-examination:

"No; there were no other clauses or conditions in the compromise agreement between Mr. Foster and myself other than the ones to which I have testified."

An examination of the letters will disclose that the parties undertook by correspondence to arrive at a basis of $200 per month. In the first letter, dated February 23d, the plaintiffs expressed a willingness to accept $200 per month for 12 months, beginning with the month's rental past due (December). On February 24th, Foster answered:

"If I understand your proposition to mean that you will begin with $200.00 per month assessment from the last payment made you, and continue for twelve months from January 1st, I will accept the same. * * *"

Upon receipt of reply thereto, Foster was to have the papers drawn. On February 25th, Eicke replied, insisting that the $200 arrangement begin in December. On February 26th, Foster replied with a new proposal, offering to pay $200 cash, his note for $400, due in 90 days, and to pay the March rental in cash on or before March 1st. On February 27th, Eicke replied to Foster, inclosing a note to him for $400, and requiring the payment of the $200, plus $16 interest. To this, Foster did not reply, and on March 20th and March 25th, Eicke wrote Foster, demanding immediate acceptance of his offer contained in the letter of February 27th. In response to this urging, Foster wrote Eicke on March 27th, stating that he had not been "able thus far to make the arrangements," and requesting Mr. Eicke to call on Monday or Tuesday, when Foster would "endeavor to straighten out the entire matter."

It is a clear proposition that up to March 27th there had been no meeting of the minds on the question of the new rental contract. In each letter a proposition is made by Eicke, and in reply a counter proposition by Foster, until March 27th, when Foster admits that he has not been able "to make the arrangements," and invites a conference to straighten the matter out. When Eicke called to keep the appointment with Mr. Foster, he discovered that Foster had gone to New York several days before, and negotiations were declared off, and the matter was then turned over to plaintiffs' attorneys, with instructions to enforce the payment of the entire indebtedness. On April 14th, plaintiffs' attorneys wrote a letter to the defendant, Foster, de-

manding payment of the entire amount at the rate of $300 per month, and threatened suit. In response thereto, on the 23d of April, Foster wired the attorneys as follows:

"Thought matter mentioned your letter 14th had been arranged through Mr. Eicke. Will be home next week and endeavor to settle satisfactory to all parties."

It seems that he undertook to reopen the old negotiations for a settlement, as shown by letter dated May 1st, from Eicke to his attorney, as follows:

"After you had seen Mr. M. E. Foster, he called me up in reference to the lease, and offered to close the matter upon the basis of our former compromise."

The letter then proceeds to state that the matter was again taken up with Mrs. Dunn, and a settlement upon an entirely different basis was proposed, with instruction that unless these terms were satisfactory to Foster, to proceed with the suit as originally ordered. At this stage, Foster hastily forwarded his checks and notes, in accordance with the original negotiations, which checks and notes were declined.

It appears from the record, and by the undisputed evidence of the only witness who testified, and all the letters which form the entire negotiations, all of which letters were introduced by defendant, Foster, and which have been heretofore set out in full, that there was no meeting of the minds upon the new proposal to pay $200 per month, instead of $300 per month. The letter in which the $200 per month is first mentioned is dated February 23, 1916, and from then until March 27th, the parties negotiated back and forth by letter, each letter containing some new condition or term which required further consideration, and on March 27th, Foster himself declared that he had not been able to make the arrangements, and asked for a conference upon the following Monday or Tuesday. It appears to be conceded that had Foster accepted the proposition any time before it was withdrawn, the parties would have been bound, and there would have been no litigation; but there was no acceptance of the offer until May 2d, long after the matter had been placed in the hands of attorneys for suit, and demand made.

A complete consideration of the first assignment brings us to the conclusion that the same cannot be sustained, but must be overruled.

The second assignment of error complains that the court erred to the prejudice of defendant in giving in charge to the jury, in response to plaintiffs' motion, and over the objection and exception of defendant, the following charge:

"In this case you are instructed to return a verdict in favor of plaintiffs for the amount due on the lease offered in evidence before you, together with 6 per cent. interest thereon"

—for the reason that there was at least sufficient evidence adduced at the trial to justify the submission to the jury of whether or not a valid unconditional agreement, supported by a sufficient consideration, was made between the plaintiffs and defendant, whereby the plaintiffs were to accept $200 per month for the year 1915, in lieu of the amount stated in the lease, and that there was a valid novation. This assignment is submitted as a proposition by appellant. On the contrary, it is urged:

"(a) The charge quoted is not a peremptory instruction, and if it did not cover the issues, special charges should have been requested.

"(b) The charge of the court, even if a peremptory charge, was the only charge, that could have been given under the evidence.

"(c) (1) That it is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established, such testimony in legal contemplation falling short of being 'any evidence'; and (2) that it is the duty of the court to determine whether the testimony has more than that degree of probative force."

It is urged by appellant, under this proposition that should we take the view that the testimony of the witness, Eicke, together with the letters between him and M. E. Foster, introduced in evidence, are susceptible of more than one construction upon the issue of whether or not there was a meeting of the minds of the parties, then it is submitted that they were at least entitled to have this issue submitted to the jury for determination. Eicke stated that such agreement was made. The letters of February 26, 1915, and February 27, 1915, might be construed to mean that there was never a complete meeting of the minds upon all of the terms of the agreement. Under Mr. Eicke's statement, the agreement was an unconditional one. Under the letters referred to, the agreement might be construed to have been one dependent upon certain conditions to be performed by Foster, and it is contended that under this view of the testimony, the only thing that the lower court was justified in doing was to submit this issue to the jury.

[2] As stated above, the plaintiffs moved to instruct for their verdict for the full amount sued for. It occurs to our minds that it was the duty, thereupon, of the defendant, if he was not satisfied with this, and desired his theory of a novation submitted to the jury, to request special instructions covering this theory of his defense. This he did not do, but contented himself with a request for a peremptory instruction, which was in effect that the novation had been established, and construing the charge that was given, as a peremptory instruction, and with excepting thereto as such.

The testimony and the letters offered by the defendant covered the entire transaction. A critical examination of each letter will disclose that something is added to the proposal on each occasion when Eicke wrote to Foster and Foster wrote to Eicke, in an ef-

fort to get together upon an agreement. After the various additions to the proposals had been discussed, Foster made no reply until Eicke had written twice, demanding an answer, whereupon he declared that he had been unable to make the arrangements, and asked for a further conference. He then went to New York, and paid no further attention until threatened with suit.

On the proposition that it is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established, and that it is the duty of the court to determine whether the testimony has more than that degree of probative force, our Supreme Court, in the case of Joske v. Irvine, 91 Tex. 583, 44 S. W. 1063, used the following language:

"From a careful examination of the cases, it appears: (1) That it is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established, such testimony, in legal contemplation, falling short of being 'any evidence'; and (2) that it is the duty of the court to determine whether the testimony has more than that degree of probative force. If it so determines, the law presumes that the jury could not 'reasonably infer the existence of the alleged fact,' and 'that there is no room for ordinary minds to differ as to the conclusion to be drawn from it.' The broad and wise policy of the law, formed in and descending to us through the crucibles of time, does not permit the citizen to be deprived of his property, his liberty, or his life upon a mere surmise or suspicion, and places upon a trained judiciary the grave responsibility of determining as a question of law whether the testimony establishes more. There is, no doubt, a possibility in all cases where the judges have to determine whether there is evidence on which the jury may reasonably find a fact, that the judges may differ in opinion, and it is possible that the majority may be wrong. Indeed, whenever a decision of the court below on such a point is reversed, the majority must have been so either in the court above or the court below. This is an infirmity which must affect all tribunals.' Ryder v. Wombwell, supra [L. R. 4 Exch. 32]."

To the same conclusion is the Supreme Court in the case of Texas Loan Agency v. Fleming, 92 Tex. 463, 49 S. W. 1040, 44 L. R. A. 279, in which case Judge Brown uses this language:

"When a Court of Civil Appeals has found from the evidence conclusions of fact, they are binding and conclusive upon this court, if there be evidence to sustain them. It is a question of law, however, for this court to determine if there be any evidence in the record to support the findings of that court. Choate v. Railway Co., 91 Tex. 409, 44 S. W. 69; Hudson v. Railroad Co., 145 N. Y. 412, 40 N. E. 8; Hannigan v. Railway Co., 157 N. Y. 244, 51 N. E. 992. It requires no less testimony to support a finding of fact made by a Court of Civil Appeals, than if such finding were made by a jury in the trial of the cause. 'It is the duty of the district court to instruct a verdict, although there may be slight testimony in support of an issue, if the probative force of such testimony be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established. Such testimony, in legal contemplation, falls short of being any evidence, within the meaning of the law.' Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059. The fact that there may be evidence which was admissible does not preclude the trial court from determining the question of its legal sufficiency. The same test is applicable to a finding of fact by the Court of Civil Appeals when challenged in this court upon the ground that it is without evidence to support it. If the testimony be such that a district judge should instruct a verdict, then a finding by the Court of Civil Appeals upon such evidence would be equally untenable as a verdict."

The testimony, which has heretofore been set out in full, is to the effect that the letters offered by defendant covered the entire transaction together with the testimony given by the witness Eicke.

It is argued that had the court submitted the case to the jury upon a general charge, amplified by special instructions, and the jury had found that a valid agreement had been completed, he would have been compelled to have granted a new trial, upon the ground that there was no evidence of any character to support such a verdict.

In our opinion, after careful consideration of the testimony, we do not find any error in the action of the court, and the assignment is therefore overruled.

By the third assignment of error, the action of the lower court is challenged as being error in giving in charge to the jury, in response to plaintiffs' motion, and over the exception and objection of defendant, the following charge, to wit:

"In this case you are instructed to return a verdict in favor of plaintiffs for the amount due on the lease offered in evidence before you, together with 6 per cent. interest thereon"

—for the reason that there was at least sufficient evidence adduced at the trial to justify the submission to the jury of whether or not plaintiffs' offer to accept $200 per month for the year 1915 in lieu of the amount stated in the lease, conditioned upon a remittance within a reasonable time, and before said offer was withdrawn, was accepted by the defendant and the condition performed, there being sufficient consideration, thus constituting a valid novation. This assignment is submitted as a proposition.

It is contended on the other hand, by appellee:

"(a) An offer based upon no other consideration than the acceptance of a less sum than the amount due is without any consideration.

"(b) An offer based upon no other consideration than the acceptance of a less sum than the amount due may be withdrawn at any time before acceptance.

"(c) The charge given, even if a peremptory instruction, was proper, because the defendant admitted liability under the lease, unless the novation which he pleaded was established and the undisputed evidence showed: (1) That the alleged offer of settlement was without consideration to support it; (2) that it was never accepted by Foster; and (3) that it was withdrawn before acceptance; (4) that, even if accepted, it was no more than an accord without satisfaction."

It is argued that this court, should we take the position that the testimony of Eicke, and

the correspondence between him and Foster, constituted only an offer to take $200 per month for a year in lieu of the amount stated in the lease, and that this offer was conditioned upon a remittance by Mr. Foster for the amount due, then there arises the issue of fact as to whether or not the remittance was made within a reasonable time under all the circumstances; that this is a question of fact for the jury, and even under plaintiffs' theory of the case should have been submitted as such. It is conceded by the appellee that had the Dunn estate, through its representative, on account of hard times, seen fit to reduce Mr. Foster's rent upon payment of certain cash and the execution of a certain note, and Mr. Foster had accepted the proposition, the parties would have been bound. Instead of doing this, Mr. Foster conducted certain negotiations by correspondence, and, when finally pushed for an answer, admitted that he could not make the arrangements which he had undertaken.

We have carefully gone through the entire testimony, briefs of the parties, and assignments, together with the law relating to the same, and our conclusion is that the judgment of the lower court must be affirmed. We believe that the action of the presiding judge in the district court was correct, that there was no issue to be presented to the jury, and, in our judgment, scarcely a suspicion of evidence is to be found in the entire record, from which men of ordinary and reasonable minds would differ. Believing that the trial court was right in his judgment, the same is in all things affirmed.